UNITED STATES of America ex rel. Gustavo LOPEZ, Petitioner,

v.

Hon. John L. ZELKER, etc., Respondent.

No. 72 Civ. 1117.

United States District Court, S. D. New York.

May 12, 1972.

Robert Kasanof, New York City, for petitioner; Pierce Gerety, Jr., New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, for respondent; Brenda Soloff, Asst. Atty. Gen., of counsel.

## OPINION

FRANKEL, District Judge.

On June 16, 1967, petitioner shot and killed Michael Descartes. The next day he left for California (and then Mexico), and he did not return to New York until some months later.

On July 24, 1967, petitioner was indicted by a New York County grand jury for first-degree murder. A federal arrest warrant was issued for him on December 1, 1967, for unlawful flight to avoid prosecution for murder.

On April 18, 1968, in Queens County, New York, petitioner was arrested by FBI Agent Donald E. Bullard pursuant to the federal warrant. He was warned of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was taken to FBI headquarters in Manhattan. At FBI headquarters, he was given a form enumerating the *Miranda* rights and announcing a waiver of them. He read it, said he understood, and signed it. He agreed then to give an oral account of the killing, and he did so, but he refused thereafter to sign a written statement.

Lopez did not know at the time that he had already been indicted. He evidently assumed, or hoped, that he would be charged with no more than manslaughter. Agent Bullard, knowing of the outstanding indictment for first-degree murder, did not report this information to petitioner.[1]

Lopez agreed to give a statement to the federal agents. He stated that he had been going with Nancy Soba but they had fought and parted. On the night of the shooting, Lopez went to an "after hours" club at the Shelton Towers

---

1. This statement reflects what is explicit in the opinion of the New York Court of Appeals though there is room for an argument that the evidentiary record is slightly ambiguous. Lopez clearly took the position that he was not told. Bullard said he "did not recall" whether he had mentioned the indictment. But it is undisputed now that the account given by the New York Court of Appeals is to be accepted as correct for our purposes.

Hotel. He stated that he knew that Nancy Soba often went there but that he did not know she would be there that night. Miss Soba was there, and Lopez was conversing with her when Descartes came up to them and started an argument. Fearing that Descartes was going to attack him, Lopez drew his gun and hit Descartes on the head with it. Lopez stated that Descartes then reached for his pocket and, thinking he was going for his gun, Lopez shot him. He then ran downstairs and went to his apartment, where he took the gun apart. The next day, according to the statement reported by Agent Bullard, Lopez drove to the Triborough Bridge and threw pieces of the gun into the water. Later that morning, Lopez said, he left for California accompanied by Carmen Virruet, with whom he had been living for some months.

Lopez was then brought to this courthouse and taken before a commissioner. The commissioner dismissed the federal charge and turned him over to the state authorities. He was brought to the office of an assistant district attorney, who informed him that he had been indicted for first-degree murder. Lopez exhibited shock upon hearing this, saying he had thought the charge would be manslaughter. He was then given his *Miranda* warnings once more, and he again said that he would make an oral statement but not a written one.

Following a pretrial evidentiary hearing on the admissibility of petitioner's statements, Supreme Court Justice Joseph A. Martinis held that the statement to FBI Agent Bullard was admissible because "the defendant intelligently understood the warnings and knowingly expressed this waiver of his constitutional rights." He held inadmissible the statement made to the assistant district attorney, ruling that "defendant intelligently understood the warnings but did not meaningfully and expressly waive his rights."

At petitioner's trial, the main prosecution witness—the only eyewitness—was Nancy Soba, who stated that she had lived with petitioner intermittently from April 1964 to September 1966; that on the night of the killing, she (with others, including Descartes) first encountered petitioner at a bar, where he threatened to kill her if she did not love him any longer; that petitioner had then left, vowing to return soon. Shortly after 3:30 a. m., she continued, she and Descartes, with others, were having a drink at the Shelton Towers club when petitioner reappeared. Petitioner ordered her out; Descartes intervened; Lopez drew a pistol and struck Descartes with it. As Descartes reached for his bloodied head, she continued, petitioner shot him in the chest, and then, as she tried to hold the victim, petitioner shot him again, in the head. Miss Soba recounted other details after the shooting, including petitioner's threat to kill her, that further buttressed the case for the prosecution.

Lena Gaytan, a member of the party with Nancy Soba, testified that she had been in the ladies' room when she heard two shots fired and that she encountered Nancy upon emerging, then saw petitioner backing down a hallway and waving a gun. Her testimony partly corroborated, partly differed from, Miss Soba's.

Carmen Virruet reported petitioner's return home in the early morning hours of June 16. She testified he told her then he had shot a man who had been with Nancy Soba when petitioner ordered her to leave the club. According to her, petitioner said the victim had started to protest or threaten, had been hit on the head by petitioner, had made motions petitioner construed as reaching for a gun, and had then been shot by petitioner.

The prosecution also proved that parts of a dismantled gun taken from petitioner's apartment were from the murder weapon, contrary to petitioner's statement to Agent Bullard about throwing it off a bridge. The evidence for the state concluded with Agent Bullard's account of that statement in full.

Except for one other witness whose testimony was not of great consequence,

the petitioner's testimony for himself was the defense. Petitioner admitted the shooting, but claimed self-defense. He swore that Descartes had been with another man that night in a bar; that both of them had threatened him on prior occasions; that he had known Descartes as a seller of drugs, who carried a gun. He reported that in the minutes preceding the shooting it was Nancy who had approached him, entreating him to take her home with him; that Descartes came over, intervened, threatened and struck petitioner. Then, petitioner swore, he had drawn his gun and struck Descartes, whereupon another man, summoned to help by Descartes, came toward them. Nancy shrieked for Descartes to kill petitioner. Descartes reached inside his coat. Then, petitioner said, he fired. Other details further contradicted the account given by Nancy Soba as well as his reported statements to Carmen Virruet and Agent Bullard.

The jury, on January 23, 1969, found petitioner guilty of murder in the second degree, and he was sentenced to a term of from 25 years to life in prison. The Appellate Division affirmed without opinion, 33 A.D.2d 733, 306 N.Y.S.2d 396.

The affirmance without opinion was in turn affirmed by a 4–3 vote in the New York Court of Appeals, with the Judges of the State's highest court dividing on the issue (the use of the statement to Agent Bullard after indictment) which is now before this court. 28 N.Y.2d 23, 319 N.Y.S.2d 825, 268 N.E.2d 628 (1971). Certiorari was denied on October 12, 1971, 404 U.S. 840, 92 S.Ct. 133, 30 L.Ed. 2d 74.

In his opinion for the Court of Appeals majority, Judge Bergan wrote that petitioner, before giving his statement to the FBI, had been "advised of his right to counsel and his right to remain silent and that any statements made could be used against him. He expressly waived those rights in a written document which he signed." 28 N.Y.2d at 24–25, 319 N.Y.S.2d at 825, 268 N.E.2d at 628. The majority went on to hold that the evidence supported the finding of a knowing and intelligent waiver. Noting that defendant "was not advised that he had been indicted when the waiver was executed," the Court held this might make a difference if there had been "willful concealment." *Id.* at 26, 319 N.Y.S.2d at 827, 268 N.E.2d at 629. But there was (and is) no suggestion of such willfulness, although it is undisputed that Agent Bullard knew of the indictment all the while.

Dissenting for himself, Chief Judge Fuld and Judge Burke, Judge Breitel wrote that the majority's ruling "backtracks on [the Court of Appeals own] principle to the effect that a defendant in a pending criminal action is entitled to the advice of a lawyer and that the right may not be waived except in the presence and with the acquiescence of counsel." *Id.* at 26, 319 N.Y.S.2d at 827, 268 N.E.2d at 629. He put aside as distinguishable "the investigative interrogation of a suspect before a criminal action is instituted"—i. e., the situation to which *Miranda v. Arizona* applies. *Id.* Rejecting the justification of waiver, he wrote (*id.* at 28–29, 319 N.Y.S.2d at 829, 268 N.E.2d at 631):

> "Whatever vitality a waiver rule might have under the *Miranda* doctrine, other considerations require a contrary rule in the area of postarraignment and postindictment interrogation. After criminal action is begun, it is no longer a general inquiry into an unsolved crime but rather a form of pretrial discovery; it is no longer a suspect who is being interrogated but the accused; the interest in affording the police an opportunity to carry on investigatory interrogation for purposes of reaching a decision to charge and in what degree is diminished. In short, the defendant is the all but irrevocable target and the preparation for his trial has begun."

The dissenters would have reversed and ordered a new trial excluding the statements testified to by FBI Agent Bullard "because obtained in a pending criminal action in the absence of counsel and

**1054**

without counsel's consent." *Id.* at 29, 319 N.Y.S.2d at 830, 268 N.E.2d at 632.

█ This court holds that the conclusion of the dissent in the New York Court of Appeals must be adopted as a matter of federal constitutional law—specifically, that petitioner's right to due process under the Fourteenth Amendment, as it embodies or "incorporates" the right to counsel under the Sixth, was violated by Agent Bullard's testimony reporting petitioner's post-indictment interrogation and resulting statements.

There is no question that the basic principle of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), applies here. See also Beatty v. United States, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (per curiam); McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) (per curiam); United States v. Garcia, 377 F.2d 321 (2d Cir.), cert. denied, 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967); United States v. Accardi, 342 F.2d 697 (2d Cir.), cert. denied, 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965). The principle, to state it briefly, forbids use at trial of statements elicited from an indicted defendant in the absence of his counsel.[2]

Not questioning that, the State argues that Lopez *waived* this protection when, after the brisk ritual of warnings tendered orally and in writing, he signed a *"Miranda* waiver" (though he refused thereafter to sign anything else). There are wide fissures in this argument.

█ First, assuming the *Massiah* protection may be waived, which is still a

debatable question,[3] the casual and relatively perfunctory invitation to a *Miranda*-style waiver is insufficient. When an indictment has come down, riveting tightly the critical right to counsel, a waiver of that right requires the clearest and most explicit explanation and understanding of what is being given up. There is no longer the possibility—and the law enforcement justification—that a mere suspect may win his freedom on the spot by "clearing up a few things." Cf. United States v. Drummond, 354 F.2d 132, 144 (2d Cir. 1965) (en banc), cert. denied, 384 U.S. 1013, 86 S.Ct. 1968, 16 L.Ed.2d 1031 (1966), rehearing denied, 385 U.S. 892, 87 S.Ct. 24, 17 L.Ed.2d 126 (1966). Even in the courtroom, where an impartial judicial officer is presumably impelled by no purpose but fairness, that officer must counsel with care and advise against the likely folly of a layman's proceeding without the aid of a lawyer. Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948); United States v. Spencer, 439 F.2d 1047 (2d Cir. 1971); United States v. Plattner, 330 F.2d 271, 276 (2d Cir. 1964). See United States v. Duty, 447 F.2d 449, 451 (2d Cir. 1971). We cannot settle for less where the waiver has been proposed by a law enforcement officer whose goals are clearly hostile to the interests of the already indicted person in custody.

Furthermore, if a swift and uncounseled waiver could ever be allowed, the one here would remain ineffectual. The State relies, of course, upon what it must show to have been "an intentional relinquishment or abandonment of a known right"

2. We put to one side cases where a person under indictment volunteers, without solicitation, the incriminating information. E. g., United States v. Accardi, *supra*; United States v. DeLoy, 421 F.2d 900 (5th Cir. 1970); Coughlan v. United States, 391 F.2d 371 (9th Cir.), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968). There is no doubt in the instant case that Agent Bullard deliberately elicited what he later reported in his testimony.

3. See United States v. Massimo, 432 F.2d 324, 327 n. 1 (2d Cir. 1971) (Friendly,

C. J., dissenting). And *compare* Hancock v. White, 378 F.2d 479, 482 (1st Cir. 1967), with United States v. Crisp, 435 F.2d 354 (7th Cir.), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); Arrington v. Maxwell, 409 F.2d 849 (6th Cir.), cert. denied, 396 U.S. 944, 90 S.Ct. 381, 24 L.Ed.2d 245 (1969); United States ex rel. O'Connor v. New Jersey, 405 F.2d 632 (3d Cir.), cert. denied sub nom Yeager v. O'Connor, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969).

—and, specifically, "an *intelligent* waiver of the right to counsel * * *." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). The petitioner did not know —though his interrogator knew and failed to tell him—that there was already an outstanding indictment for first-degree murder. Lopez must have been aware, to be sure, that he was wanted for the killing of Descartes. But whatever he hoped to accomplish by incriminating statements to a law enforcement officer— including, perhaps, persuasion toward his evident contention that the crime was at most manslaughter—the existence of an indictment was a matter of obvious moment. The very mention of so grave a fact by Agent Bullard might well have had a freezing and silencing impact. Surely, a lawyer, for all his training, would want to know of a circumstance this solemn and definitive before risking incrimination for himself or advising a client on such a risk. It is not persuasive to argue that a layman, because he is more defenseless to begin with, may be held to have achieved an "intelligent waiver" in ignorance of so stark a legal fact.

■ With deference to the New York Court of Appeals majority, it does not seem a sufficient rejoinder to say Agent Bullard was not guilty of "willful concealment." Here, as in other contexts, reliance upon the "subjective good faith" of law enforcers would have the intolerable effect of leaving the safeguards of the Constitution to the vague, variable and partisan "discretion of the police." Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The Sixth Amendment protects not merely the right to counsel, but the conjoined right "to be informed of the nature and cause of the accusation * * *." That is not a benefaction to be sought or a prize to be won; it is a *right*. It is sufficient for our purposes that the right—at a critical moment, and without respecting the corollary right to counsel—was ignored while the FBI Agent proceeded to extract from petitioner himself evidence to be used at the trial of the already pending indictment.

■ Finally, the State argues that if there was error, it was harmless. The contention was not attempted in the state courts, where it is not unfamiliar, e. g., People v. Miles, 23 N.Y.2d 527, 544, 297 N.Y.S.2d 913, 245 N.E.2d 688 (1969) (Breitel, J.); People v. Gonzalez, 27 N.Y. 2d 53, 58, 313 N.Y.S.2d 673, 261 N.E.2d 605 (1970), and none of the 13 state judges concerned with the case has suggested it as a point worth considering. It is, in any event, rejected. The state prosecutor evidently knew full well the reason for his fight to use Agent Bullard's evidence, and he relied heavily upon it in summation.[4] With a single eyewitness of assailable credibility, and with circumstances of a generally sordid character on all sides, it was a potent tactic to nail petitioner's story at the time of apprehension, with the august auspices of an FBI agent, and then score the defense for petitioner's many contradictions of that story on the witness stand. At the least, it is not possible to dismiss lightly what would appear to have been the prosecutor's appraisal at the live trial. Thus, even apart from the plausible argument that petitioner might not have chosen to take the stand at all but for Bullard's evidence, cf. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); United States ex rel. O'Connor v. New Jersey, 405 F.2d 632, 638 n. 20 (3d Cir.), cert. denied sub nom. Yeager v. O'Connor, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969), the State fails to carry its burden of showing harmlessness. Chapman v.

---

4. Arguing his proof that petitioner had lied, the prosecutor developed the shifts from the statements reported by Carmen Virruet (Vicky) to those reported by Agent Bullard to petitioner's testimony at the trial. He stressed as "the most important thing" the omission from petitioner's out-of-court statements of the assertion at trial that Nancy Soba had yelled at a climactic moment.: "Kill him [Lopez], kill him, his gun is jammed."

California, 386 U.S. 18, 20, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The petition is granted. Petitioner will be released within 60 days unless he is granted a new trial during that period.

It is so ordered.