UNITED STATES of America, Appellee,

v.

Lionel MOHABIR, Defendant-Appellant.

No. 776, Docket 79–1423.

United States Court of Appeals,
Second Circuit.

Argued March 3, 1980.

Decided June 23, 1980.

Benjamin Zelermyer, New York City (Poulson & Zelermyer, New York City, of counsel), for defendant-appellant.

Robert S. Litt, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Mary Jo White, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FEINBERG, NEWMAN and KEARSE, Circuit Judges.

FEINBERG, Circuit Judge:

This case requires us to consider under what circumstances an indicted defendant will be deemed to have waived his right to counsel at interrogation by a prosecutor. Lionel Mohabir appeals from a judgment of conviction in the United States District Court for the Southern District of New York, after a jury trial before Morris E. Lasker, J., on two counts charging conspiracy to defraud the United States by manufacturing counterfeit immigration documents, 18 U.S.C. § 371, and knowingly receiving a package containing counterfeit immigration documents and rubber stamps that had been imported illegally into the United States. 18 U.S.C. §§ 545 and 2. Appellant argues that the evidence was insufficient to support his conviction, that the judge should have suppressed a post-indictment statement obtained from appellant and that the judge's charge erroneously allowed the jury to convict appellant without

finding that he possessed the requisite criminal knowledge. Since we agree that the suppression ruling was incorrect, we reverse the judgment of conviction and remand for a new trial.

I

■ The evidence at trial disclosed an illegal plan to enable aliens to enter the United States from Canada and to work here without complying with the immigration laws. Central to the scheme was the proposed use in combination of two immigration forms, one Canadian and the other American. The first—form IMM–1000—is issued to a citizen of a Commonwealth country by Canadian immigration officials as evidence that the foreigner is a landed immigrant, the Canadian equivalent of a permanent resident of the United States. The recipient of an IMM–1000 form, properly filled out and stamped, may enter the United States from Canada without a visa as a visitor simply by presenting the IMM–1000 form at the border. The second document to be used in the scheme—form I–94—may be issued by United States immigration officials to an alien here as a visitor. A visitor is not permitted to remain in this country permanently or to work here; those privileges are allowed only to aliens who are admitted as permanent residents, or immigrants. But such permission, in the form of an immigrant visa, is limited by restrictive quotas and may take years to obtain. However, once an alien is properly admitted here as a visitor, he can apply to have his status adjusted to that of a permanent resident. The same restrictive quotas govern as if the alien had applied for an immigrant visa while abroad. But an alien already here as a visitor who makes such an application is issued form I–94; upon request by the alien, the form will be stamped to indicate that he is permitted to be employed here pending adjustment of status.

Thus, improper use of the two forms could provide an easy way to circumvent immigration quotas and restrictions on aliens working in the United States. By counterfeiting IMM–1000 forms and the Canadian immigration rubber stamps used to validate them, one could produce a document allowing citizens of Commonwealth countries to enter the United States illegally without a visa, since they would appear to be landed immigrants residing in Canada.[1] By stamping blank I–94 forms—available from a variety of sources, including airlines—with counterfeited American immigration stamps, one could create a document allowing such aliens to remain in this country and work here, as if they were here legally and had properly applied for permanent resident status.

There was ample evidence before the jury to support the charges that appellant and his ex-wife, co-defendant Angela Ragunandan,[2] conspired to put such a scheme into effect and knowingly received a package illegally imported into the United States. From the evidence at trial the jury could justifiably have found the following: Ragunandan, a resident of Chicago, ordered several rubber stamps and copies of IMM–1000 forms in February 1979 from a Chicago printing company; the stamps included counterfeit copies both of the Canadian stamps used on IMM–1000 forms and of the American stamps used on I–94 forms. In early March, Ragunandan come to New York City, where she stayed with appellant Mohabir, her ex-husband. Shortly after her arrival, Ragunandan and appellant went to the Empire Stamp Company in New York City. Appellant showed the clerk an altered impression of a Canadian immigration stamp, consisting of a crown and a date within a rectangular border, and asked to have duplicates made of it. However, the proprietor informed the clerk that the crown could not be reproduced. The crown and the date then were crossed out, and

---

1. Appellant and his co-defendant are both natives of Guyana, a Commonwealth country.

2. Ragunandan was convicted with appellant on counts one and two of the indictment and also

on another count, which charged her alone with possessing counterfeit immigration documents. 18 U.S.C. §§ 1426 and 1546.

appellant ordered three copies of the stamp's rectangular border alone. Appellant left his name and home address and personally paid the deposit for the stamps, which Ragunandan picked up several days later. Over the next several weeks, Ragunandan placed orders for other rubber stamps; appellant accompanied her on one of the occasions when she did so. The stamps so obtained apparently were cut up and reassembled to make more precise replicas of the official stamps used on IMM–1000 and I–94 forms.

At the end of March 1979, appellant and Ragunandan drove to Toronto, Canada, bringing with them the counterfeit forms and stamps. In Toronto, they stayed the night with Ragunandan's sister-in-law, Subai Ramnarain, who had not been expecting them; Mrs. Ramnarain testified that she did not know how Ragunandan and appellant spent their time in Toronto. Several hours after defendants left Toronto to return to New York, Ragunandan phoned her sister-in-law and told her that she had left a package behind in the house; Ragunandan asked Mrs. Ramnarain to mail the package to her at the address of a friend and told her to declare on the customs form that the package contained cosmetics. On April 6, a United States Customs Inspector opened the package in an attempt to assess the proper duty. The inspector discovered that the package contained counterfeit stamps and IMM–1000 forms, as well as I–94 forms; some of the forms had been partially filled out or stamped.

A "controlled delivery" of the package was then arranged. Ragunandan was sent a notice of delivery, and on April 17 she went with appellant to the post office specified in the notice. The postal clerk tried to locate the package based on the description given to him by Ragunandan; he showed the defendants several packages, in response to one of which appellant said, "No, that's not it. Would you try another one?", and indicated another parcel on the rack. The clerk was unable to locate their package, however, and defendants left. When Ragunandan returned the next day to pick up the package, she was arrested. Appel-

lant surrendered a little over one month later. After his surrender, appellant was interrogated by an Assistant United States Attorney; during the course of his interrogation, appellant admitted having gone with Ragunandan to the stamp companies, to Canada and to the post office. He denied, however, having placed an order at the Empire Stamp Company, and denied any knowledge of the contents of the package. Appellant also claimed that he did not know that Ragunandan was engaged in any illegal activity.

Appellant does not dispute the facts recited above; he argues only that this evidence was insufficient to prove that he had knowledge either of the nature of the conspiracy or of the contents of the package. According to appellant, the government's case rested on only four pieces of evidence: the placement of the order for stamps at the Empire Stamp Company; his visit to Canada; his remark to the postal clerk; and the false exculpatory statement he made in the course of his interrogation. Appellant contends that none of these pieces of evidence supports an inference that he knew of the immigration scheme. Thus, appellant concedes that he placed an order for stamps; he denies, however, that this order can provide a basis for inferring knowledge of the "essential nature of the conspiratorial plan," see *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977), since there was no evidence at all that appellant knew that the stamp he ordered to be copied was an altered Canadian immigration stamp. Similarly, he contends that there is nothing in the record to indicate that the trip to Canada was anything but a visit to see relatives. Nor, appellant contends, does his remark at the post office indicate that he had knowledge either of the contents of the package or of the fact that it had been imported unlawfully; appellant notes that his comment was not made until after Ragunandan had described the package to the clerk. Moreover, he argues that there was no evidence that the stamps he ordered found their way into the package. Finally, appellant submits that

his false exculpatory statement, even assuming it was properly admitted, shows at most evidence of consciousness of guilt, rather than of guilt itself, see *United States v. Di Stefano*, 555 F.2d 1094, 1104 (2d Cir. 1977); such evidence is insufficient to support a conviction, he also asserts, where the other evidence is as weak as it was here. See *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir. 1975).

We are not persuaded by appellant's arguments. Even putting to one side the statement he made at his interrogation, which we discuss below, the evidence was sufficient to allow a jury to conclude that appellant was guilty. Appellant's claim to the contrary is based on a "microscopic dissection of bits and pieces of evidence," see *United States v. Dardi*, 330 F.2d 316, 325 (2d Cir.), cert. denied, 379 U.S. 845, 869, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); but as we have made clear in previous cases, the evidence must be viewed as a whole, "since one fact may gain color from others." See *United States v. Tramunti*, 500 F.2d 1334, 1338 (2d Cir.), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). When so viewed, the evidence here was sufficient for the jury to infer that appellant knew both the nature of the conspiracy and the contents of the package. Appellant's actions at Empire, for example, support an inference that he was more than simply an unwitting participant in the immigration scheme: it was appellant who "did most of the talking," placed the order, and left the deposit and his name. As in *United States v. Carneglia*, 468 F.2d 1084, 1088 (2d Cir. 1972), cert. denied, 410 U.S. 945, 93 S.Ct. 1391, 35 L.Ed.2d 611 (1973), this "purposeful" activity on the part of appellant, in which Ragunandan appears to have played only a secondary role, suggests a prior familiarity on his part with the nature of the stamps; since the final counterfeit stamps were composites assembled from other stamps, it is particularly significant that appellant proceeded to order ·"3 stamps, border only" after being told it was not possible to reproduce the crown on the stamp he wanted copied.

Likewise, a jury could reasonably find that the trip to Toronto, when viewed in conjunction with the other evidence, was not simply for the purpose of visiting relatives; defendants left for Toronto without checking whether Mrs. Ramnarain was at home and the latter testified that she did not know how defendants spent their time in Toronto. It seems clear that defendants brought the fraudulent stamps and documents with them to Toronto; since the scheme involved the illegal entry of immigrants from Canada, a jury could infer that the trip to Toronto was designed to further the conspiracy. Finally, appellant's statement at the post office, while susceptible of an innocent interpretation, provides a sufficient evidentiary basis for the inference that he was familiar with the package. See *United States v. Carneglia*, supra, 468 F.2d at 1088 ("Perhaps the jury might reasonably have accepted [defendant's] view, but surely it was not required to."). Contrary to appellant's related argument, we also believe that the record fairly suggests that the stamps appellant ordered at Empire were incorporated into the stamps found in the package.

In addition to the evidence discussed above, there was other support in the record for an inference of knowledge. The jury could justifiably have found that appellant accompanied Ragunandan not only to Empire, but to another company that manufactured stamps. Furthermore, the package sent from Canada bore appellant's name and address on the inner side of the wrapping, from which the jury could infer that the defendants originally intended to send the package directly to appellant. Thus, this is not a case like *United States v. Di Stefano*, supra, 555 F.2d at 1103, where the defendant's isolated act was found to be insufficient to support the inference that she knowingly engaged in the conspiracy charged; here, appellant engaged in acts that furthered the conspiracy over a period of several weeks. Moreover, appellant's acts were such that the jury could find that he had an awareness of the immigration scheme itself, rather than simply "a generalized suspicion" of illegal activity. See

*United States v. Calabro*, 467 F.2d 973, 982 (2d Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). Accordingly, we hold that the evidence here, even apart from the statement obtained at appellant's interrogation, was sufficient to allow a jury to convict him of the crimes charged.

## II

Appellant's second argument is that Judge Lasker erred in refusing to suppress a statement that an Assistant United States Attorney obtained from appellant after his indictment but before he secured counsel. Appellant argues that his Sixth Amendment right to counsel was violated by this post-indictment prosecutorial interrogation; the government contends that appellant knowingly and intentionally waived his right to counsel. The substantial and important issues thus raised are implicit in prior recent opinions of this court but have not yet been definitively resolved.

The facts relevant to this claim are as follows: Appellant and Ragunandan were both indicted on May 21, 1979. The next morning, appellant's mother told him that five men were looking for him in connection with Ragunandan. At the latter's suggestion, appellant called Ragunandan's attorney, who advised him to surrender and to "see" the prosecutor in charge of the matter. Appellant went to the United States Courthouse and was met at about 1:30 P.M. by agents of the Immigration and Naturalization Service (INS) who arrested him, advised him of his *Miranda* rights, told him he had been indicted and summarized the charges against him. The INS agents then questioned him about his participation in the illegal immigration scheme.

After appellant was fingerprinted, photographed and interviewed by the Pretrial Services Agency, he was questioned again at about 3:30 P.M. by an Assistant United States Attorney. The latter also told appellant that he had been indicted but, like the INS agents, did not explain what this meant. The Assistant, however, did give a copy of the indictment to appellant, which he read. The Assistant then advised appellant of his rights as follows, reading from a government form entitled "Statement of Defendant after Indictment and Before Arraignment Made to Assistant United States Attorney":

> In a few minutes you will be taken before a United States Judge [or Magistrate] who will fix bail in your case.
>
> Do you understand that?
>
> You have a constitutional right to refuse to answer any of my questions.
>
> Do you understand that?
>
> You have an absolute right to remain silent, and if you choose to answer any questions, any statement you do make can be used against you in a court of law.
>
> Do you understand that?
>
> You have a right to consult an attorney and to have that attorney present during this interview.
>
> Do you understand that?
>
> If you do not have funds to retain an attorney, an attorney will be appointed to represent you and you do not have to answer any questions before this attorney is appointed and you can consult with him.
>
> Do you understand that?
>
> You may pick and choose those questions you wish to answer, and you may stop at any time.
>
> Do you understand that?
>
> Understanding your rights, are you prepared to answer questions without an attorney?

To each of these questions appellant responded "Uh-hum—nodding yes." The Assistant then questioned appellant for over an hour, and he answered every question put to him by the Assistant and by the INS agents who were also present.

Prior to this interview, another Assistant United States Attorney notified the magistrate's office of the possibility that an arraignment and assignment of counsel might take place later in the afternoon. During the course of the interrogation, that Assistant entered the room where the interview was taking place and asked appellant "if he would need counsel appointed." After re-

ceiving an affirmative answer, the Assistant informed the magistrate that "there would likely be a counsel appointment that afternoon"; the magistrate in turn called appellant's present counsel at approximately 4:10 or 4:15 and told him to appear for a counsel appointment. Meanwhile, however, the interrogation continued. It was not until about 5:00 P.M. that appellant was arraigned before the magistrate, who at that time appointed his present counsel to represent him.

A few weeks later, appellant's counsel moved to suppress the statements appellant had made on May 22 on the ground that he had been denied his Sixth Amendment right to counsel. At an evidentiary hearing, the district judge heard testimony from the INS agent who had first interrogated appellant, from the Assistant United States Attorney who questioned him next, and from appellant. Thereafter, in an oral opinion the judge suppressed appellant's first statement to the INS agent because the advice of appellant's rights had been given to him so rapidly that they were "confusing" and "almost unintelligible." However, the judge denied the motion to suppress appellant's later statements to the Assistant because appellant's rights were explained to him "in an intelligible manner," appellant understood them, and knowingly and intentionally waived them. At trial, certain of Mohabir's statements were admitted into evidence, and they played an important part of the government's case against appellant.[3]

The parties apparently agree that the warnings given by the Assistant to appellant, fully quoted above, complied with the requirements of the Fifth Amendment and the teachings of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); similarly, appellant has made no claim either below or before us that his statement was involuntary within the meaning of *Miranda*. But this is simply the beginning of analysis, for appellant's Sixth

Amendment right to counsel had attached at the time of his indictment, which preceded his interrogation. See *Kirby v. Illinois*, 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–1882, 32 L.Ed.2d 411 (1972) (plurality opinion). Accordingly, the central issue before us is whether appellant waived his rights under the Sixth, rather than the Fifth, Amendment. See *Brewer v. Williams*, 430 U.S. 387, 397–98, 97 S.Ct. 1232, 1238–1239, 51 L.Ed.2d 424 (1977); *Massiah v. United States*, 377 U.S. 201, 204–06, 84 S.Ct. 1199, 1201–1203, 12 L.Ed.2d 246 (1964). The distinction is a crucial one: building upon Judge Friendly's influential dissent in *United States v. Massimo*, 432 F.2d 324 (2d Cir. 1970), cert. denied, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971), a number of cases in this court have made clear that waivers of Sixth Amendment rights must be measured by a "higher standard" than are waivers of Fifth Amendment rights.

In *Massimo*, the defendant was interrogated in the absence of counsel after his arraignment and after he apparently had signed a written waiver. In contrast to the majority of the panel, Judge Friendly found it necessary to discuss the issue now before us. As he pointed out in his dissent:

> The interrogation of Massimo after arraignment raises serious questions not simply with respect to the Fifth Amendment under *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which are cited by my brother Smith, but more importantly, with respect to the Sixth under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Since Massimo's "criminal prosecution" had begun, the Sixth Amendment entitled him to counsel at any "critical stage," *Hamilton v. Alabama*, 368 U.S. 52, 54, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963), which inter-

---

**3.** As the government concedes in its brief, the statement from the interrogation admitted at trial—consisting of certain admissions and false exculpatory statements—was "particular-

ly important" to the prosecution case, since the key issue for the jury was appellant's guilty knowledge.

rogation to elicit his guilt surely was, unless the protection was waived. Warnings by law enforcement officers and subsequent action by the accused that might suffice to comply with Fifth Amendment strictures against testimonial compulsion would not necessarily meet what I regard as the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached. . . . Indeed, in the case of a federal trial there would seem to be much ground for outlawing all statements resulting from post-arraignment or indictment interrogation (as distinguished from volunteered statements) in the absence of counsel when the questioning has no objective other than to establish the guilt of the accused, even if the Sixth Amendment does not require so much.

432 F.2d at 327 (citations omitted).[4]

In *United States v. Satterfield*, 558 F.2d 655 (2d Cir. 1976), this court clearly accepted the distinction between Fifth and Sixth Amendment rights made in Judge Friendly's dissent and put bite into it. In that case, as in this one, the defendant was interrogated after indictment in the absence of counsel. Even though the defendant had been given *Miranda* warnings that, like those given here, satisfied Fifth Amendment standards, we upheld the suppression of three post-indictment statements by the defendant, because the government had failed to meet the "heavy burden" of showing a "knowing and intelligent" waiver of Sixth Amendment rights. We there pointed out:

Judge Knapp . . . found . . . that the government had not met the heavy burden of showing that Satterfield had "knowingly and intelligently" waived his sixth amendment rights. *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct.

2525, 45 L.Ed.2d 562 (1975), *quoting Johnson v. Zerbst*, 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). . . . Even if Satterfield's statements were voluntary for purposes of the fifth amendment, we agree with Judge Knapp that they were involuntary with "regard . . [to] the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached." Judge Friendly, dissenting in *United States v. Massimo*, 432 F.2d 324, 327 (2d Cir. 1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 633 (1971).

558 F.2d at 657.

Shortly thereafter, we again acknowledged that interrogation of an indicted defendant in the absence of counsel raises grave Sixth Amendment questions. In *United States v. Lord*, 565 F.2d 831 (2d Cir. 1977), we stated:

Since Schwartz had been indicted prior to his arrest and his right to counsel had therefore attached before he was arrested, the use of his confession at trial was unconstitutional unless he waived his Sixth Amendment right to counsel before he confessed. . . . When government agents or prosecutors choose to interrogate an indicted, unrepresented defendant, they assume the heavy burden of proving that any inculpatory statements thus obtained were voluntarily given after a valid waiver of the right to counsel.

Id. at 839 (citations and footnotes omitted). The panel held in *Lord* that the government had met its heavy burden, since the evidence showed that defendant had signed a waiver and had confessed after only a half-hour of questioning; the panel also stressed that defendant was not emotionally upset and "out of control," in contrast to the defendant in *Satterfield*, supra,[5] and that

---

4. The majority in *Massimo* did not reach the constitutional issues discussed by Judge Friendly because defendant's trial counsel had stipulated to the admissibility of defendant's statements; the statements were thus considered only in the context of a claim that trial counsel's representation of defendant had been inadequate.

5. Appellant argues to us that the characterization of the defendant in *Satterfield* as "distraught" and "obviously out of control" was inaccurate, since Judge Knapp—after reargument, and at the government's request—explicitly withdrew any suggestion that Satterfield was "not capable" of an effective waiver. See

defendant was familiar with his rights, having been arrested three times before.

Finally, in *Carvey v. LeFevre*, 611 F.2d 19 (2d Cir. 1979), we again underscored the difference between questioning a defendant before and after indictment. *Carvey* involved post-indictment statements that complied with *Miranda* but were not preceded by any indication to the defendant that an indictment was pending against him. The failure to inform the defendant of the fact of his indictment was held to preclude a knowing waiver of Sixth Amendment rights. In one of his last opinions for this court, Judge Smith emphasized how important it is for an indicted defendant to "appreciate the gravity of his legal position" and "the urgency of his need for a lawyer's assistance." Id. at 22. For this reason, *Carvey* emphasized once again that warnings that might satisfy "*Miranda's* less stringent requirements" did not necessarily satisfy the "higher standard" our precedents require in examining alleged waivers once the Sixth Amendment attaches. Id. *Carvey* also firmly disposed of the government's argument that a finding of waiver is called for when there is no evidence that defendant was either coerced or, as in *Satterfield*, distraught and "out of control"; as Judge Smith pointed out:

> Neither coercion nor emotional unrest . . . need be shown in order to find that the accused lacked a full understanding of his legal posture and therefore could not have made a rational, intelligent waiver of his right to counsel. 611 F.2d at 22.[6]

 There is thus a line of authority in our court that the government has a "heavy burden" of showing a waiver of Sixth Amendment rights by an indicted defendant and that the burden cannot be discharged unless a "higher standard" is satisfied than that met by merely showing that the accused made his statements after appropriate *Miranda* warnings were given.

*United States v. Satterfield*, 417 F.Supp. 303, 304 (S.D.N.Y.1976).

The reasons for requiring a higher standard for waiver of the Sixth Amendment right to counsel are clear. Once criminal proceedings have been formally instituted against a defendant—as they were here by the filing of the indictment—the need for counsel is particularly acute. As Justice Stewart noted in *Kirby v. Illinois*, supra, 406 U.S. at 689–90, 92 S.Ct. at 1882:

> The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable. See *Powell v. Alabama*, 287 U.S., at 66–71, 53 S.Ct., at 63; *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *Spano v. New York*, 360 U.S. 315, 325, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (Douglas, J., concurring) (footnote omitted).

The indictment thus marks a crucial point for the defendant; it also marks the point after which any questioning of the defendant by the government can only be "for the purpose of buttressing . . . a prima facie case." See *People v. Settles*, 46 N.Y.2d 154, 163, 412 N.Y.S.2d 874, 879, 385 N.E.2d 612, 616 (1978). As Judge Fuld noted in *People v. Waterman*, 9 N.Y.2d 561, 565, 216 N.Y.S.2d 70, 74, 175 N.E.2d 445, 447 (1961), "[s]ince the finding of the indictment presumably imports that the People have legally sufficient evidence of the defendant's guilt of the crime charged . . . ., the necessities of appropriate police investigation 'to solve a crime, or even to absolve a

**6.** In *Carvey*, the admission of the unconstitutionally obtained statements was held to be harmless error. The government has not made a similar argument here. See note 3 supra.

suspect' cannot be urged as justification for any subsequent questioning of the defendant." (Citations omitted.)

■ Thus, after prosecution has begun, the right to obtain the assistance of counsel at all crucial stages is essential if both the symbol and reality of a fair trial are to be preserved; the Sixth Amendment guarantees the accused "that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967) (footnote omitted). See generally Kamisar, Brewer v. Williams, Massiah, and Miranda : What is Interrogation? When Does it Matter?, 67 Geo.L.J. 1, 91–92 (1978); Grano, Rhode Island v. Innis: A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions, 17 Am. Crim.L.Rev. 1, 25–28 (1979). Because this Sixth Amendment right is so important the Supreme Court has held that every reasonable presumption against waiver must be indulged. *Brewer v. Williams*, supra, 430 U.S. at 404, 97 S.Ct. at 1242; see also *Carvey*, supra, 611 F.2d at 21. As we recently reaffirmed,

> When an indictment has come down, riveting tightly the critical right to counsel, a waiver of that right requires the clearest and most explicit explanation and understanding of what is being given up.

Id. at 22 n.1, quoting *United States ex rel. Lopez v. Zelker*, 344 F.Supp. 1050, 1054 (S.D.N.Y.) (Frankel, J.), aff'd without opinion, 465 F.2d 1405 (2d Cir.), cert. denied, 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed.2d 501 (1972).

■ Despite these pronouncements, however, appellant was not given any warnings by the Assistant United States Attorney other than the standard *Miranda* warnings given to any person interrogated while in custody. It is true that appellant also was told that he was indicted and was given a copy of the indictment to read; however, neither the INS agents nor the Assistant explained what it meant to be indicted.[7] While informing a defendant that he has been indicted is highly important, see *Carvey*, supra, 611 F.2d at 22, it is not in and of itself necessarily sufficient to safeguard the defendant's Sixth Amendment rights; mere knowledge of a pending indictment, without understanding of its meaning, may not allow the accused to "appreciate the gravity of his legal position or the urgency of his need for a lawyer's assistance." Id. at 22. The record here suggests that appellant did not understand the gravity of his position; he apparently hoped that he would aid his case by telling "his side of the story." Yet as Judge Knapp pointed out in *United States v. Satterfield*, 417 F.Supp. 293, 296 (S.D.N.Y.), aff'd, 558 F.2d 655 (2d Cir. 1976):

> Prior to indictment—before the prosecution has taken shape—there may be reasons why a suspect might rationally wish to deal with agents without the intervention of counsel. By getting in their good graces and being useful to the government he might be able altogether to avoid indictment or any legal entanglement. No such opportunity is open to him after a grand jury has spoken. At that point he cannot make any arrangement with agents or prosecutor that is not subject to ultimate approval by the court, and counsel is obviously important to advise him on what terms such approval is likely to be forthcoming and how best to obtain it.

---

7. The only differences between the warnings given to indicted and unindicted individuals are evidently reflected on the two government statement forms in use at the time of this interview; one is entitled "Statement of Defendant After Indictment and Before Arraignment Made to Assistant United States Attorney" and the other is entitled "Statement of Defendant Before Arraignment Made to Assistant United States Attorney." The post-indict-ment interview form states that "an indictment has been filed," whereas the pre-indictment interview form recites "You have been arrested." The final question in each form is also different: the post-indictment form concludes, "Understanding your rights, are you prepared to answer questions without an attorney?", while the pre-indictment form ends "would you like to answer some questions?" In all other substantive respects the forms are identical.

**1150**

See also *People v. Settles*, supra, 46 N.Y.2d at 163, 412 N.Y.S.2d 874, 385 N.E.2d 612.

■ The *Miranda* warnings appellant received did not call attention to this critical distinction; nor in this case can merely informing defendant of the fact of his indictment be considered a satisfactory substitute for a clear and explicit explanation of the Sixth Amendment rights defendant is giving up. See *Carvey*, supra, 611 F.2d at 22 n.1. The government argues that the lack of additional warnings is irrelevant; it takes the position that whatever the "higher standard" suggested by our prior cases means, "it does *not* mean that a defendant must be given warnings any more detailed than Mohabir was given here." (Emphasis in original.) We disagree, for, as the Supreme Court made clear in *Brewer*, an effective waiver requires both "comprehension" and "relinquishment." 430 U.S. at 404, 97 S.Ct. at 1242. In *Brewer*, the defendant comprehended but did not expressly surrender his right to counsel; in contrast, here, in the absence of adequate explanation of the significance of an indictment, it would not be proper to hold that defendant understood the import of the right he was giving up.[8] Cf. *United States v. Brown*, 569 F.2d 236, 246–48 (5th Cir. 1978) (en banc) (Simpson, J., dissenting).

■ We note, moreover, that the government's practice [9] of conducting post-indictment interviews of this type seems designed to elicit precisely the type of damaging uncounseled confessions that appellant gave

here. Cf. *United States v. Duvall*, 537 F.2d 15, 23–24 (2d Cir.), cert. denied, 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). The sequence of events in this case is particularly telling: prior to the interview of appellant, one Assistant United States Attorney notified the magistrate's office that a counsel appointment might take place later that afternoon; that Assistant then spoke to appellant during the course of the interview, at which time appellant indicated that he would need appointed counsel; and yet the interrogation continued thereafter. In *Duvall*, supra, 537 F.2d at 23–24, a panel of this court suggested its disapproval of the related prearraignment interview procedure followed by the United States Attorney's Office for the Southern District,[10] whereby the government routes "through the prosecutor's office, for a last round of uncounseled interrogation, a defendant who will shortly appear before a magistrate and receive counsel." We warned then that "such interrogations are peculiarly likely to run afoul of *Miranda*." Id. at 24.

Such an interview procedure, as conducted on these facts with an indicted but uncounseled defendant, runs even greater risks under the Sixth Amendment. As Judge Frankel aptly stated in *United States ex rel. Lopez v. Zelker*, supra:

Even in the courtroom, where an impartial judicial officer is presumably impelled by no purpose but fairness, that officer must counsel with care and advise against the likely folly of a layman's proceeding without the aid of a lawyer. *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct.

---

8. *Brewer* thus lends weight to our conclusion that additional warnings were necessary here to afford appellant an understanding of his right. It is true, of course, that the Court found that the defendant in *Brewer* had comprehended his right to counsel, although no additional warnings were given in that case by the police. But in *Brewer*, the defendant's "understanding of his right to counsel was reinforced by numerous pre-interrogation consultations with two lawyers." See *United States v. Brown*, 569 F.2d 236, 247–48 (5th Cir. 1978) (en banc) (Simpson, J., dissenting). Here, in contrast, there was no such consultation; nor is there anything in the record that suggests that de-

fendant's understanding of his position and his right to counsel was "reinforced" by any other means. Compare *United States v. Lord*, supra, 565 F.2d at 840 (defendant, "[h]aving been arrested three times prior to the occasion at issue, . . . was familiar with his rights"; also, defendant read and signed "standard 'advice of rights' form and a waiver form").

9. The government represents that it is standard procedure for an Assistant to interview indicted defendants prior to their arraignment. See note 7 supra.

10. See note 7 supra.

316, 92 L.Ed. 309 (1948); *United States v. Spencer*, 439 F.2d 1047 (2d Cir. 1971); *United States v. Plattner*, 330 F.2d 271, 276 (2d Cir. 1964). See *United States v. Duty*, 447 F.2d 449, 451 (2d Cir. 1971). We cannot settle for less where the waiver has been proposed by a law enforcement officer whose goals are clearly hostile to the interests of the already indicted person in custody.

344 F.Supp. at 1054. An impartial judge, before accepting a guilty plea or allowing the defendant to defend himself pro se, must conduct a "penetrating and comprehensive examination" of the defendant in open court. See *Von Moltke v. Gillies*, 332 U.S. 708, 723–24, 68 S.Ct. 316, 323, 92 L.Ed. 309 (1948) (plurality opinion); see also *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Yet the government urges that a prosecutor in his own office, without any explanation to establish understanding of the Sixth Amendment right, may question an uncounseled, indicted defendant in order to obtain a confession of guilt, and may do so even after, as in this case, the prosecutor knows counsel will be appointed by the court within the hour. We see no persuasive reason for a distinction of such magnitude affecting the Sixth Amendment right of a defendant, and we

reject it. The government contends that a number of our prior cases have held warnings identical to those given here to be sufficient, but we believe that these decisions are all distinguishable.[11]

Accordingly, we hold that the government failed to carry its heavy burden of proving that appellant's purported waiver satisfies the "higher standard" that our cases have adopted in the Sixth Amendment context. Some additional indication was required that appellant understood the nature and the importance of the Sixth Amendment right he was giving up. Under the circumstances, the District Court should have suppressed appellant's statement to the Assistant United States Attorney; since this error was not harmless, a new trial will be required.

Normally, we would end our discussion at this point. However, considerations of judicial administration suggest that, in the exercise of our supervisory powers, we offer some guidance to the government and to the district courts regarding the Sixth Amendment problems posed by post-indictment interrogation conducted in the absence of counsel. Three possible methods of dealing with statements obtained in such interrogation quickly suggest themselves. First, treat the statements as inadmissible unless they have been preceded by further

---

11. See *United States v. Lord*, supra, 565 F.2d at 839–40 (defendant was "familiar with his rights" because of three prior arrests; see note 8 supra); *United States v. Armedo-Sarmiento*, 545 F.2d 785, 792 (2d Cir. 1976), cert. denied, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977) (only *Miranda* rights involved); *United States v. Messina*, 507 F.2d 73, 76–78 (2d Cir. 1974), cert. denied, 420 U.S. 993, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975) (evidence volunteered after consultation with appointed attorney); *United States v. Barone*, 467 F.2d 247, 249 (2d Cir. 1972) (attorney consulted prior to statements). Other decisions of this court are likewise distinguishable. See generally *United States v. Satterfield*, supra, 558 F.2d at 657 (discussing prior opinions). Our summary affirmance in *United States v. McGrath*, 459 F.Supp. 1273 (S.D.N.Y.1978), aff'd without opinion sub nom. *United States v. Kearns*, 615 F.2d 1351 (2d Cir. 1979), is without precedential value. See Local Rule § 0.23 of the United States Court of Appeals for the Second Circuit.

The government also claims that the law in other circuits suggests that no additional warnings were necessary here. See *United States v. Brown*, 569 F.2d 236, 238–39 (5th Cir. 1978) (en banc); *United States v. Monti*, 557 F.2d 899, 904 (1st Cir. 1977); *United States v. Cobbs*, 481 F.2d 196, 199–200 (3rd Cir.) cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Springer*, 460 F.2d 1344, 1350–54 (7th Cir.), cert. denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); *Coughlan v. United States*, 391 F.2d 371, 372 (9th Cir.), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968). However, the law of the other circuits on this question is not consistent. See, e. g., *Brewer v. Williams*, supra, 430 U.S. at 406 n. 11, 97 S.Ct. at 1243 (citing cases); *United States v. Brown*, supra, 569 F.2d at 245 (Simpson, J., dissenting) (collecting cases revealing the "great confusion among and within the Circuits" on this issue). See note 13 infra (citing cases).

warnings and advice by the prosecutor sufficient to assure that the defendant's Sixth Amendment right has been fully comprehended. See *United States v. Callabrass*, 458 F.Supp. 964, 966–67 (S.D.N.Y.1978); *United States v. Satterfield*, supra, 417 F.Supp. at 296–97; *United States ex rel. Lopez v. Zelker*, supra, 344 F.Supp. at 1054.[12] Second, as a condition of admissibility require such warnings and advice to be given by a judicial officer rather than by the prosecutor. Finally, there is the possibility, referred to by Judge Friendly in his dissent in *Massimo*, supra, 432 F.2d at 327, of "outlawing all statements resulting from post-arraignment or indictment interrogation (as distinguished from volunteered statements) in the absence of counsel when the questioning has no objective other than to establish the guilt of the accused, even if the Sixth Amendment does not require so much."[13]

12. In *Callabrass*, Judge Leval suggested that the prosecutor or agent give both *Miranda* warnings and explanations along the following lines:

> that a criminal indictment has been filed, with explanation of the significance of that fact; that the results of the defendant's case could be seriously affected by any statements he makes at this time; that defendants customarily obtain the advice of lawyers in these circumstances, and that a lawyer would be better able to understand and advise the defendant as to the desirability and the dangers of making statements and answering questions. The explanations necessary may of course vary depending on the age, experience and emotional condition of the defendant, as well as other factors.

458 F.Supp. at 967.

13. Interpreting their own constitution, the New York courts have held that the state is "forbidden to seek an uncounseled waiver of an indicted defendant's right to counsel." See *People v. Settles*, supra, 46 N.Y.2d at 164, 412 N.Y.S.2d at 880, 385 N.E.2d at 617. See also ABA, Standards Relating to the Administration of Criminal Justice, Providing Defense Services § 5–7.3 (2d ed. 1978) (no uncounseled waiver should be accepted).

Some federal circuit courts appear to have announced a similar rule, relying on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *McLeod v. Ohio*, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965). See *United States v. Durham*, 475 F.2d 208, 210–11 (7th Cir. 1973); *United States ex rel. O'Connor v. New Jersey*, 405 F.2d 632, 634–37

We believe that there are strong policy reasons, grounded in ethical considerations, for not adopting the first alternative of having the prosecutor give further warnings to the defendant. The government itself points out that a prosecutor "is, in many senses, an adversary of the defendant, and, as such, is counselled not to give him legal advice"; in support of this proposition, the government cites the ABA Code of Professional Responsibility, DR 7–104(A)(2).[14] If anything, the government's point is understated. Once a person has been indicted, the prosecutor is his adversary in every sense, not just "in many senses." On the other hand, no such problems are presented if the second course is adopted and the warnings are given by a judicial officer, such as a magistrate. The government concedes that, in contrast to a prosecutor, "a judge inquiring into a defendant's waiver of counsel at trial is a

(3rd Cir.), cert. denied, 395 U.S. 923, 89 S.Ct. 1770, 23 L.Ed.2d 240 (1969); *Hancock v. White*, 378 F.2d 479, 480–82 (1st Cir. 1967). But see, e. g., *United States v. Monti*, 557 F.2d 899, 904 (1st Cir. 1977); *United States v. Cobbs*, 481 F.2d 196, 199–200 (3rd Cir.), cert. denied, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Crisp*, 435 F.2d 354, 358–59 (7th Cir. 1970), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). While *Brewer v. Williams*, supra, 430 U.S. at 405–06, 97 S.Ct. at 1242–1243, left open the question whether an uncounseled waiver was constitutional, see note 15 infra, it did make clear that the holding in *Massiah* is not limited to the unique facts of that case. See 430 U.S. at 400, 97 S.Ct. at 1240 (that incriminating statements in *Massiah* were elicited surreptitiously is "constitutionally irrelevant").

14. DR 7–104(A) provides:

> During the course of his representation of a client a lawyer shall not:
> (1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.
> (2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

(Footnotes omitted.)

neutral party who can inform the defendant about such matters without fear of conflict." However, the government goes on to argue that such neutral intervention is not a necessary predicate to waiver at a pre-trial stage.

■ We disagree with this contention. The Supreme Court has stressed that a defendant's right to, and need for, counsel at the pre-trial stage is no less important than at trial, see, e. g., *Massiah v. United States*, supra, 377 U.S. at 204–05, 84 S.Ct. at 1201–1202, and that the "strict standard [applied in determining the question of waiver] applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings." *Brewer v. Williams*, supra, 430 U.S. at 404, 97 S.Ct. at 1243. To apply that standard meaningfully to a waiver of the right to counsel alleged to occur when an indicted defendant is interrogated, it must appear that the defendant has been fully and effectively informed of his Sixth Amendment right. To avoid the ethical problems inherent in imposing on the prosecutor this obligation to inform and to secure the benefits of the neutral intervention of a judicial officer at this critical stage, we conclude, in the exercise of our supervisory power, that a valid waiver of the Sixth Amendment right to have counsel present during post-indictment interrogation must be preceded by a federal judicial officer's explanation of the content and significance of this right. Normally, this would occur at the appearance before the court or magistrate required by Fed.R.Crim.P. 9(c)(1). In addition to the advice of rights given at an appearance required by Fed.R.Crim.P. 5(a), following an arrest upon a complaint, a defendant arrested after indictment should be shown the indictment and told by the judicial officer that he has been indicted, the significance of an indictment, that he has a right to counsel, and the seriousness of his situation in the event he should decide to answer questions of any law enforcement officers in the absence of counsel.

The advantages of such a rule are clear. If advice is given by a judicial officer, disputes as to what occurred will be rare and legal battles as to whether the defendant's comprehension of his Sixth Amendment right was sufficient to support a finding of waiver will be less likely, though disputes as to whether the right to counsel was relinquished will doubtless remain, as in *Brewer v. Williams*, supra. We realize that the number of confessions obtained under the present practice from uncounseled, indicted defendants may decrease, but this is the price of defining in a more precise way the "higher standard" that must be met for waiver of the Sixth Amendment right. Moreover, it is not uncommon for a counseled defendant to confess and plead guilty; the high rate of guilty pleas attests to that.

We put off until another day consideration of the third alternative suggested above, that of simply "outlawing" all statements following uncounseled waivers by indicted defendants. Such a course would be the most drastic of the three, and might run counter to the policy that a defendant constitutionally can insist upon proceeding without counsel even though he has been fully advised of the folly of doing so.[15] See *Faretta v. California*, supra, 422 U.S. at 835–36, 95 S.Ct. at 2541. Accordingly, in the exercise of our supervisory power, we hold that with respect to statements resulting from interrogation or its functional equivalent, see *Rhode Island v. Innis*, —— U.S. ——, —————, 100 S.Ct. 1682, 1687–1689, 64 L.Ed.2d 297 (1980), as distinguished from volunteered statements, an indicted defendant's waiver of the right to counsel after the date of this opinion is ineffective unless a judicial officer has first given him warnings and advice sufficient to assure comprehension of that right.

### III

■ Since we are remanding for a new trial, we think it advisable to discuss briefly

---

**15.** *Brewer v. Williams*, supra, 430 U.S. at 405–06, 97 S.Ct. at 1243, explicitly did not decide whether "Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments." (Emphasis in original.)

appellant's final claim, which is that the trial judge's charge to the jury was erroneous. At the government's request, the judge instructed the jury on "conscious avoidance" of knowledge. Appellant argues to us both that there was no evidentiary basis for giving such a charge and that the charge as given was so deficient as to deprive him of a fair trial. We disagree on both counts. As our discussion in Part I suggests, the government produced sufficient evidence here to justify a reasonable juror in concluding that if appellant was not aware of the essential nature of the conspiracy, it was only because he was consciously shutting his eyes to such knowledge. Since the circumstances here were such that they should have apprised appellant of "the unlawful nature of [his] conduct," we hold that it was proper to give a charge on conscious avoidance. See *United States v. Joyce*, 542 F.2d 158, 161 (2d Cir. 1976), cert. denied, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 548 (1977).

Likewise, we believe that the charge given here was not erroneous. The judge instructed the jury that they could convict appellant only if they found he had actual knowledge but that in determining whether appellant acted knowingly, the jury could consider whether he had "deliberately closed his . . . eyes to what otherwise would have been obvious to him . . . ." The judge also made clear that an inference of such conscious avoidance was justified only if the jury found that the defendant "was aware of a high probability" that the particular crimes were being committed, and even then the inference of knowledge could not be justified if the jury found that the "defendant actually believed to the contrary." Furthermore, the judge stated that "guilty knowledge cannot be demonstrated simply by showing mere negligence or even foolishness on the part of a defendant." The charge was thus substantially similar to charges that have been specifically approved by this court. See, e. g., *United States v. Morales*, 577 F.2d 769, 773–75 (2d Cir. 1978); *United States v. Brawer*, 482 F.2d 117, 128–29 (2d Cir. 1973). Under the circumstances, there is no basis for finding reversible error in the charge.

Accordingly, for the reasons stated in Part II of this opinion, we reverse the judgment of conviction and remand the case for a new trial. We wish to express our appreciation to Benjamin Zelermyer, Esq., appointed counsel under the Criminal Justice Act, for his excellent representation of appellant.