STATE OF WEST VIRGINIA

*v.*

TOMIE LEE MOLLOHAN

(No. 13927)

Decided December 2, 1980.

*Duttine, Thomas, Covert, King & Riffee, M. Joseph Thomas,* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Gregory W. Bailey,* Deputy Attorney General, *Paula D. Dean,* Assistant Attorney General, for defendant in error.

NEELY, CHIEF JUSTICE:

Tomie Lee Mollohan appeals from his conviction and sentence to life imprisonment without mercy for the murder of Cebert Pauley, which he received 7 January 1974 in the Circuit Court of Kanawha County. Appellant makes one primary assignment of error; namely, that the trial court improperly admitted an out of court confession into evidence. We find that the confession was made in the

absence of counsel after formal proceedings had been initiated and we therefore reverse and remand.

On 13 January 1973, Cebert Pauley's body was found in his cabin above his home in Brounland, West Virginia. His pockets were turned inside out and a large sum of money which he was known to carry was missing. The appellant's fingerprints were found on a potted meat can that was in the cabin. During the trial several witnesses identified the appellant as a hitchhiker who had been picked up in the vicinity of the crime.

The appellant was arrested for the murder in Manchester, New Hampshire on 19 March 1973 by the Manchester police. Two West Virginia state troopers, J. L. Haynes and W. J. Shaw, who were assigned to investigate the murder and who had been the first officers to arrive at the murder scene, drove to New Hampshire to return the appellant to West Virginia. The appellant decided, upon the advice of appointed counsel, to waive extradition proceedings on 22 March 1973. That same day he was released into the custody of the troopers who testified that they gave him *Miranda* warnings at the outset, although not in the presence of appellant's appointed counsel. He was transported to Springfield, Massachusetts and spent the night in the city jail.

The troopers testified that during the journey they did not interrogate the appellant, but as Trooper Haynes testified:

> [O]f course, we listen to Mr. Mollohan all the way and questioned him about his exploits in Kentucky all the way to Springfield. Upon arriving in Springfield, during all this time we did not challenge him, so we decided that we would leave him some food for thought. That was when we explained to him that we had removed his fingerprints from the building where the crime had occurred and could place him there .... Now, we told him we could place him there in that building, we knew he had been there. That was, more or less, the thing that we left for food for thought. The next morning we asked him if he had thought about it.
> Q  Did he reply to you? Did he reply to you that he

had thought about these matters?

A Well, if I remember, the specific question was whether or not—I don't remember the specific question—anyhow, the accused said something to the effect that—he was very solemn, he said right then he just didn't want to say anything.

Q When was this?

A This was immediately upon leaving the Police garage.

The next morning, the troopers again advised the appellant of his *Miranda* rights and they asked appellant if he had given any thought or consideration to what had been said the previous evening. According to Trooper Shaw's testimony "he then indicated, very solemnly, as best as I can recall, with his head down, that he wished to say nothing at that time. Then, he indicated that he had a conversation or had spoken with a preacher the previous evening, and that ended our conversation."[1]

Shortly thereafter, during the continuation of the trip, the troopers stopped at a small store for chewing tobacco. While Trooper Haynes was in purchasing tobacco, Trooper Shaw then asked the appellant if he had received any consolation from his talk with the preacher. The appellant responded that he wanted to make a statement whereupon Trooper Shaw produced a waiver of rights form which appellant read and signed.

---

[1] On cross-examination Trooper Shaw's recollection of the appellant's refusal to discuss the murder is even clearer. He testified:

Q Then, on March 23rd, when you picked him up at Springfield, Massachusetts, at the jail, again when you got him in the car you gave him his rights, is that correct?

A That is correct.

Q And did Mr. Mollohan indicate to you at that time when you gave him those rights, in reply to either your inquiry or Trooper Haynes's inquiry, whether he wanted to discuss his involvement with Cebert Pauley?

A I don't understand the question.

Q Isn't it a fact, Trooper, that he said to you words to this effect, "I don't want to talk to you."

A That is correct except he was very emphatic, he did not wish to talk at this time, "I wish to not make any statement at this time." He emphasized at this time.

Appellant's version of the trip differs from that of the troopers; however, it is not necessary to consider his allegations of threats and physical beatings. It is worth noting that appellant was handcuffed and completely at the mercy of the troopers in whose custody he was held. Dr. Richard Kitching testified that appellant had a verbal I.Q. of 70, a performance I.Q. of 52, and a combined I.Q. of 60. He stated that would place "his current intellectual functioning at the defective level of intelligence" although other tests such as Bender-Gestalt only place him "in the mild mentally retarded group statistically." It is also significant that the troopers knew that appellant was highly religious because he told them on the first day that he had come to know Christ and has serious religious convictions. Trooper Haynes testified that the appellant had a well-worn Bible and that "he [the appellant] had joined the church, he seemed to be very sincere about living right again and all that."

The facts presented in this case may be analyzed on three independent grounds: (1) that under the totality of circumstances the defendant's confession was involuntary; (2) that the confession was obtained in violation of the defendant's fifth amendment rights as enunciated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); or (3) that the confession was secured in violation of the defendant's sixth amendment right to counsel as enunciated in *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964).[2] We see no need to review the *Miranda* doctrine, and

---

[2] The facts surrounding the voluntariness of this confession bear a marked resemblance to the factual patterns in two recent United States Supreme Court opinions, *Rhode Island v. Innis*, ___ U.S. ___, 100 S.Ct. 1682, 64 L.Ed. 2d 297 (1980) and *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L.Ed.2d 424 (1977) where the Supreme Court elected to follow different analyses. In *Rhode Island v. Innis* the Court defined the meaning of interrogation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and found that "off hand remarks" made between two police officers in the suspect's presence did not constitute interrogation when the comments were not designed to elicit an incriminating response. The defendant in *Innis* had been arrested and informed of his *Miranda* rights, but he had only been in custody a short period before he offered incriminating information. On the other hand, formal proceedings had already been initiated against the defendant in *Brewer* when he offered the information that incriminated him and the

elect as did the United States Supreme Court in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed. 2d 424 (1977), to reverse on the ground that Mollohan was denied the right to the assistance of counsel.

We find the circumstances of this case to be constitutionally indistinguishable from those presented in *Massiah v. United States, supra.* In both instances formal criminal proceedings had been initiated against the defendant and in both cases admissions were "deliberately elicited from [defendant] after he had been indicted and in the absence of counsel." *Massiah, supra,* 377 U.S. at 206, 84 S.Ct. at 1203. In *Brewer, supra,* the majority concluded that the fact that the statements had not been "surreptitiously elicited" through eavesdropping as they had been in *Massiah* to be "constitutionally irrelevant."

Since Mollohan's right to counsel attached at the extradition hearing under *Escobedo v. Illinois,* 378 U.S. 478, 492, 84 S.Ct. 1758, 1765, 12 L.Ed. 2d 977 (1964) which established that the constitutional role of counsel extends to the stage "when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession," the paramount issue before us is whether the waiver was voluntarily executed. Under *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), the State carries the heavy burden of proving "an intentional relinquishment or abandonment of a known right," and it is clear that the State cannot measure up to that standard in this instance.[3]

Reviewing the circumstances of the waiver we easily reach the conclusion that the waiver was coerced. The

defendant had consulted with his counsel before embarking on a 200 mile journey with two police officers. In *Brewer,* the Court found the statements by the police to be the equivalent of interrogation, but the majority's decision was grounded on the denial of the defendant's right to counsel.

[3] Some courts have held that a so-called *"Massiah* right to counsel" cannot be waived in the absence of counsel or without the consent of counsel. *See* cases collected in *Lopez v. Zelker,* 344 F.Supp. 1050, 1054 & n.3 (S.D.N.Y.), *aff'd without opinion,* 465 F.2d 1405 (2d Cir.), *cert. denied,* 409 U.S. 1049, 93 S.Ct. 529, 34 L.Ed. 2d 501 (1972).

troopers, who were assigned to investigate the case, threatened Mollohan with the evidence of his fingerprints at the murder scene; they played upon his avowed religious beliefs; and, they took advantage of his limited mental capacity. All of this took place over two days when Mollohan was isolated from everyone except the preacher and the two police officers. He was completely at their mercy during the two day journey and it is difficult to construct a more restrictive custodial setting. Certainly this setting constituted the interrogation environment of which the Court warned in *Miranda* where interrogation combined with custody would "subjugate the individual to the will of his examiner" and thereby undermine his own resolve. *Miranda, supra,* 384 U.S. at 457-58, 86 S.Ct. at 1618-19.

For the foregoing reasons, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*