OPINION OF THE COURT
Aileen Haas Schwartz, J.
Not even the procedural formalities of the courtroom mute the stark reality of a 10 year old in the dock charged with the fatal shooting of another 10-year-old playmate. The petition alleges that respondent “did recklessly cause the death of S. M. (age 10) by shooting S. M. in the right side of chest with a .38 caliber Smith and Wesson, a deadly weapon.”
The accused’s age assumes heightened significance within the context of the instant motion to suppress a statement made to police officers during custodial interrogation. Three principal issues emerge: 1. Does Miranda v Arizona (384 US 436) apply to juveniles in the wake of Fare v Michael C. (442 US 707), particularly footnote 4 (p 717)? *239 2. Does the totality-of-the-circumstances standard enunciated in Fare v Michael C. (supra) govern, and if it does, has the petitioner met its burden of establishing a voluntary, intelligent and knowing waiver of the Fifth Amendment privilege against self incrimination and the right to counsel under Miranda and Matter of Gault (387 US 1)? 3. As a matter of Federal constitutional law or New York law, is a juvenile deemed to lack capacity to waive the Miranda right to counsel in the absence of counsel?
With minor exceptions, the circumstances of the custodial interrogation are not disputed:
In the course of an investigation into the shooting of another 10-year-old youth earlier in the day, police officers apprehended respondent at school and drove him to his home. Respondent’s mother consented to entry into the family’s apartment. Five or six detectives in plain clothes, including a captain, were present. Not long thereafter, respondent’s “stepfather” arrived. Questioning of respondent in the presence of his mother commenced at 12:05 or 12:10 p.m. in the kitchen. About 10 minutes had elapsed since entry into the home during which period there was a conversation with the mother. The questioning by Detective Marini was preceded by a reading of “Miranda warnings” printed on a “departmental form.” Detective Marini read:
1. “You have the right to remain silent, and refuse to answer questions, do you understand?”
2. “Anything you say may be used against you in a Court of Law, do you understand?”
3. “You have the right to Counsel and to consult with an attorney, before speaking to the Police, and to have an attorney present during questioning now, or in the future, do you understand?”
4. “If you can’t afford an attorney, one will be provided for you without cost, do you understand?”
5. “If you don’t have an attorney available, you have the right to remain silent until you have had an opportunity to consult with one. Do you understand?”
6. “[N]ow that I have advised you of your rights, are you willing to answer questions without any attorney present?”
*240 After each of the above six warnings, the detective asked the mother whether she understood. The mother answered “Yes” to each query. Following the mother’s answer to each query, the detective asked respondent if he understood, and respondent answered “Yes” each time.
Although he could not recall the exact words used, Detective Marini testified he also “paraphrased the rights because I wanted to make sure that they understood, and that she knew what I was asking her, and why I was there, and what her rights were.” Detective Marini then asked the mother and respondent “whether or not they wanted to make a statement.” They said “Yes”, and respondent made a statement.
Detective Ragone arrived at the apartment at 1:10 p.m. Further questioning of the respondent took place in the living room. Respondent’s mother was present. Detective Marini and Detective Ragone were in the same room. The other officers remained in other parts of the apartment. The circumstances of that period of questioning were not fully presented.
At 3 p.m., the respondent, respondent’s mother and “stepfather” were taken to the police station. At 3:45 p.m., respondent and his mother were taken to Room 101, the room designated for the questioning of children pursuant to section 724 of the Family Court Act. Detective Marini and Detective Ragone were present. Immediately after arrival, Detective Ragone advised respondent and his mother of “their rights” by reading from a form “Interrogation Warnings of Persons in Police Custody”, as follows, according to his testimony:
1. “You have the^right to remain silent, and refuse to answer any questions.”
2. “Anything you say may be used against you in a Court of Law.”
3. “You have the right to consult an attorney before speaking to the Police, and to have an attorney present during any questioning now, or in the future.”
4. “I advised that if he could not afford an attorney, one would be provided without cost.”
*241 5. “If you don’t have an attorney available, you have the right to remain silent until you have the opportunity to consult with one.”
6. “Now that I have advised you of your rights, are you willing to answer any questions without an attorney present?”
After each of the six statements, Detective Ragone asked respondent’s mother if she understood, to which she responded, “Yes” and then he asked respondent if he understood, and respondent answered, “Yes”.
Immediately after the reply in the affirmative to the last query, respondent made the statement now challenged.
Neither the interrogation by Detective Marini nor that by Detective Ragone was recorded. At neither interrogation did respondent or his mother request an explanation of the detective’s statements, time to answer, or an attorney. Both interrogation periods were brief. Ten minutes elapsed from the entry into Room 101 at the precinct until departure from that room. The detectives testified that the mother appeared distraught and cried but that she was not crying during any period of interrogation. Both detectives testified that respondent appeared calm at all times observed by each of them. Detective Marini and Detective Ragone took special precautions to prevent questioning by others and to limit the number of detectives present during periods of questioning.
Respondent presented two expert witnesses: Dr. Robert Goldstein, an expert in child and adolescent psychiatry, and Dr. James Wulach, an expert in forensic child and adolescent psychology.
Dr. Robert Goldstein examined respondent at Kings County Hospital on January 16,1981. The standard structured psychiatric examination conducted by the psychiatrist included an assessment of past history and a mental status examination. Dr. Goldstein reviewed the clinical summaries prepared at the Kings County Hospital and later reviewed the psychological tests carried out by Dr. Wulach. The examination also focused upon the respondent’s “ability to comprehend and appreciate the Miranda warnings and his ability to understand his right to waive *242 them.” Dr. Goldstein concluded that respondent’s intellectual capacity placed him “in the borderline or dull normal category, with a severe deficit in verbal abstract reasoning.” The doctor found respondent to be emotionally and intellectually immature for a 10 year old. Based upon all the material before him and his own examination including specific inquiry into the subject of the words and concepts of the “Miranda warnings”, the psychiatrist was of the opinion that “it would be impossible for [respondent] to understand and comprehend or appreciate the questions” put to him by Detective Ragone and Detective Marini. Further, the psychiatrist testified, “on the day of the incident — the offense * * * respondent was in a state of-psychological shock and trauma and that [condition] further aggravated or compounded [his intellectual] deficit.” Dr. Goldstein found the respondent’s reported “calmness” consistent with a feature of psychological shock, to wit, “extreme denial of reality” of the consequences to his playmate from the shooting.
Dr. James Wulach examined respondent at Kings County Hospital on February 12, 1981. The psychological interview included psychological testing which the doctor administered personally and inquiries to test respondent’s ability to comprehend the words and concepts of the “Miranda warnings” and waiver. The respondent’s intelligence level was found to be at the “borderline retarded level”, the equivalent level of a child eight years of age. Dr. Wulach’s interview included an evaluation of respondent’s ability to comprehend and appreciate the words and concepts of the “Miranda warnings”. The psychologist testified that respondent “would not have the verbal skills *** and intellectual skills to understand either the specific wordings contained on this card [the form “Miranda warnings’” used by Detective Marini and Detective Ra-gone], nor would he have the ability to understand the concepts of rights contained in several of the warnings”.
Petitioner argues: (1) that compliance with all Miranda and New York State decisional and statutory procedural prerequisites to admissibility of respondent’s statement has been demonstrated and (2) that the evidence establishes beyond a reasonable doubt that the respondent vol *243 untarily, knowingly and intelligently waived the right to counsel and the privilege against self incrimination prior to making the challenged statement. Respondent contends: (1) that the petitioner has not shown compliance with the Miranda prerequisites to admissibility in that the police officers failed to evaluate and to establish respondent’s capacity to understand before advising him pursuant to Miranda v Arizona (384 US 436, supra), (2) that under New York law, a juvenile’s right to counsel is more extensive than that of an adult and hence there could be no waiver of that right under the instant circumstances, and (3) that there was no voluntary, knowing and intelligent waiver because respondent lacked the ability to comprehend the concepts of the instant rights and waiver.
To turn to the principal issues as set forth above:
I. Does Miranda v Arizona (supra) apply to juveniles in the wake of Fare v Michael C. (442 US 707, supra), particularly footnote 4 (p 717)?
Challenge to the admissibility of a statement to police officers during custodial interrogation invokes consideration of Miranda v Arizona (supra). Miranda announced a comprehensive system of governing precepts and mandatory procedures to safeguard the Fifth Amendment privilege against self incrimination:
1. The Fifth Amendment privilege against self incrimination is fully applicable to custodial interrogation by law enforcement officers. (384 US, at pp 460-461.)
2. The right to counsel including “the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege under the system we delineate today.” (384 US, at p 469.)
3. “Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.” (384 US, at p 444.)
4. The individual may waive the privilege against self incrimination and the right to counsel, provided the waiver is voluntarily, knowingly and intelligently made. The State has the burden of demonstrating such waiver, and *244 the standard is the same standard prescribed in Johnson v Zerbst (304 US 458, 464), “an intentional relinquishment or abandonment of a known right or privilege.”
5. Compliance with the procedures formulated or “other fully effective means” must be demonstrated as a prerequisite to the “use [of] statements, whether exculpatory or inculpatory, stemming from custodial interrogation”. (384 US, at p 444.)
Chief Justice Warren’s opinion discussed fully the pragmatic ramifications to law enforcement as well as the jurisprudential underpinnings of the Miranda decision. The Miranda plan was designed to eliminate uncertainty regarding the obligations of law enforcement officers and the rights of the individual during custodial interrogation. As envisaged, post-Miranda cases have been concerned, generally speaking, with implementation and application of the Miranda formula.
Chief Justice Burger has well characterized the present status of Miranda v Arizona (384 US 436, supra): “The meaning of Miranda has become reasonably clear and law enforcement practices have adjusted to its strictures; I would neither overrule Miranda, disparage it, nor extend it at this late date.” (Rhode Is. v Innis, 446 US 291, 304 [Burger, Ch. J., concurring].)
Notwithstanding the validity of that characterization, recent Supreme Court pronouncements do touch upon fundamental aspects of the Miranda doctrine, and the decisions and expressed considerations reflect the very concern voiced by the four dissenting Justices in Miranda v Arizona (384 US, at pp 507, 538-539, 544): Miranda adopted a per se approach in striking departure from the traditional voluntariness rubric testing admissibility under the due process clause.
Fare v Michael C. (442 US 707, supra) exemplifies such revival of the concern of the Justices dissenting in Miranda v Arizona (supra). Fare v Michael C. (supra) involved the Supreme Court of California’s equation of the effect of a request by a juvenile to see his probation officer with a request for counsel within the context of the Miranda doctrine, namely, a per se invocation of the juvenile’s Fifth *245 Amendment privilege, as a matter of Federal constitutional law. The holding in Fare v Michael C. (supra), that the Miranda concept of counsel is the traditional one of “lawyer” and that, assuming without deciding the applicability of Miranda to “juvenile proceedings”, the concept is no broader, reflects the court’s increasing concern with per se exclusionary rules. At the outset, the court characterized the extension of the per se aspects of Miranda by the California Supreme Court as presenting an “important question”, and stressed, “This Court, however, has not heretofore extended the per se aspects of the Miranda safeguards beyond the scope of the holding in the Miranda case itself.” (442 US, at p 717; see to same effect North Carolina v Butler, 441 US 369.) Miranda, neither in words nor principle, the court concluded, mandated expansion of the per se effect of a request for counsel to include a juvenile’s request for a probation officer.
Significantly, in spite of its seemingly innocuous format, footnote 4 of the Fare v Michael C. (supra, p 717) opinion of the court states: “Indeed, this Court has not yet held that Miranda applies with full force to exclude evidence obtained in violation of its proscriptions from consideration in juvenile proceedings, which for certain purposes have been distinguished from formal criminal prosecutions. See McKeiver v. Pennsylvania, 403 U.S. 528, 540-541 (1971) (plurality option). We do not decide that issue today.”
The Supreme Court’s caveat regarding the application of Miranda “with full force” in juvenile proceedings poses an enigma. New York State has afforded juveniles the entire panoply of the Miranda safeguards. Assumption of applicability of Miranda in juvenile proceedings has been predicated upon Matter of Gault (387 US 1). Matter of Gault (supra, p 44) explicitly addressed the import of Miranda v Arizona (supra), stating, “In light of Miranda v. Arizona *** we must also consider whether, if the privilege against self-incrimination is available, it can effectively be waived”. Does footnote 4 in Fare v Michael C. (supra) require that the following parts of Matter of Gault (supra, p 55) be deemed inapplicable to custodial interrogation of a juvenile? “We conclude that the ° constitutional privilege against self-incrimination is applicable in the case of juve *246 niles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique — but not in principle — depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in eliminating the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.”
“This Court”, the court reminded in Matter of Gault (supra, p 45) “has emphasized that admissions and confessions of juveniles require special caution.” Reference was made to Haley v Ohio (332 US 596), in which the court found an inculpatory statement involuntarily made and reversed the conviction of a 15-year-old youth for murder. Gault also referred, with favor, to Matter of Gregory W. (19 NY2d 55), in which the New York Court of Appeals held that the privilege against self incrimination applies in juvenile delinquency cases, and to New York State statutory provisions, to wit, sections 724 and 741 of the Family Court Act prescribing special safeguards for the juvenile.
Fare v Michael C. (442 US 707, supra), thus, at most, appears to cast some doubt on the applicability of some procedural directives of the Miranda formulae.
Whatever uncertainties Fare v Michael C. (supra) may engender, the issues in this proceeding are not encompassed within Miranda’s “miscellany of * * * directives,” to use the words of Justice Harlan dissenting in Miranda v Arizona (384 US 436, 505, supra). The rights implicated in this case go to the very essence of the individual’s privilege against self incrimination and right to counsel, rights expressly deemed applicable to juveniles by Matter of Gault (387 US 1, supra). At issue also is the question of waiver, a matter likewise expressly decided in Matter of Gault (supra; see, also, Schneckloth v Bustamonte, 412 US 218, 240). The Supreme Court’s concern with per se exclu *247 sionary rules does not reflect a less than profound commitment to the Fifth Amendment privilege against self incrimination. (See Estelle v Smith, 451 US 454.) Manifestly, those parts of the Miranda doctrine that invoke fundamental precepts of our constitutional system can hardly be deemed inapplicable to a juvenile in a delinquency proceeding. Nor is Matter of Gault’s (supra, p 13) effect in the three principal areas diluted because the opinion expressly states that the court is not concerned with the procedures applicable to the prejudicial stages of the juvenile process.
II. Does the totality-of-the-circumstances standard enunciated in Fare v Michael C. (supra) govern, and if it does, has the petitioner met its burden of establishing a voluntary, intelligent and knowing waiver of the Fifth Amendment privilege against self incrimination and the right to counsel under Miranda (supra) and Matter of Gault (387 US 1, supra)?
Fare v Michael C. (supra, p 725) instructs that except for the per se rules explicitly mandated therein, Miranda supports “inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel.” Of particular consequence to the instant matter, the court expressly noted (p 725) assuming, arguendo, applicability of Miranda to juveniles: “This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits — indeed, it mandates — inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile’s age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of the Fifth Amendment rights, and the consequences of waiving those rights.”
*248 Absent further Supreme Court developments, as a matter of Federal constitutional law, that standard must be deemed to govern in juvenile proceedings.
III. As a matter of Federal constitutional law or New York law, is a juvenile deemed to lack capacity to waive the Miranda right to counsel in the absence of counsel?
Respondent’s contention that during custodial interrogation a juvenile may not waive counsel in the absence of counsel raises anew the recurring query whether there should be a “per se rule barring all waivers by minors” (United States ex rel. Stephen J. B. v Shelly, 430 F2d 215, 218; see, also, Matter of Lawrence S., 29 NY2d 206, 208).
Fare v Michael C. (442 US 707, supra) appears to foreshadow the Supreme Court’s position regarding the respondent’s argument that a juvenile may not waive the Miranda right to counsel in the absence of counsel as a matter of Federal constitutional law. That contention prescribes an added safeguard for juveniles, and the nature of the safeguard requires per se exclusionary effect for noncompliance.
As the following discussion of Federal constitutional law and New York constitutional and statutory law will develop, the critical impact of the claimed added safeguard during custodial interrogation would affect the pre-Sixth Amendment right to counsel stage.
Kirby v Illinois (406 US 682), which involved the right to counsel at an identification procedure pursuant to United States v Wade (388 US 218) and Gilbert v California (388 US 263), provides an instructive analogy. Kirby v Illinois (supra, p 689), held that the Sixth Amendment right to counsel attaches at the “initiation of adversary judicial criminal proceedings — whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.” The Supreme Court declined to depart from the traditional view of the constitutional right to counsel and to expand the right to a confrontation stage prior to the initiation of judicial criminal proceedings. Interestingly, the one-sentence concurring opinion of Justice Powell in Kirby v Illinois (supra, p 691), reads, “As I would not extend the Wade-Gilbert per se exclusionary rule, I concur in the result reached by the Court.”
*249 The Miranda doctrine does apply to custodial interrogation even prior to adversary judicial proceedings. Nevertheless, the Supreme Court has recently further refined the Miranda request-for-counsel per se exclusionary rule, in Rhode Is. v Innis (446 US 291) in reasoning not inconsistent with Kirby v Illinois (supra). Rhode Is. v Innis (supra) concerned a statement made by an individual while en route to a police station after arrest and Miranda warnings and a request for counsel. The statement disclosing the location of a shotgun interrupted an overheard conversation between two police officers concerning the danger to handicapped children who attended a school in the search area. An indictment charging murder followed. The opinion of the court delineated the issue in precise and narrow terms. “In Miranda v. Arizona *** the Court held that, once a defendant in custody asks to speak with a lawyer, all interrogation must cease until a lawyer is present. The issue in this case is whether the respondent was ‘interrogated’ in violation of the standards promulgated in the Miranda opinion.” (446 US, at p 293.) The Supreme Court defined “interrogation” and decided that interrogation was not involved.
Once again, by way of footnote, the court, after indicating that the State court’s reliance on Brewer v Williams (430 US 387) was “erroneous”, painstakingly explained a significant point: “Our decision in Brewer rested solely on the Sixth and Fourteenth Amendments right to counsel *** That right, as we held in Massiah v. United States *** prohibits law enforcement officers from ‘deliberately eliciting]’ incriminating information from a defendant in the absence of counsel after a formal charge against the defendant has been filed. Custody in such a case is not controlling; indeed, the petitioner in Massiah was not in custody. By contrast, the right to counsel at issue in the present case is based not on the Sixth and Fourteenth Amendments, but rather on the Fifth and Fourteenth Amendments as interpreted in the Miranda opinion. The definitions of ‘interrogation’ under the Fifth and Sixth Amendments, if indeed the term ‘interrogation’ is even apt in the Sixth Amendment context, are not necessarily interchangeable, since the policies underlying the two constitu *250 tional protections are quite distinct.” (446 US, at p 300, n 4.)
The Rhode Is. v Innis footnote 4 (supra) is no mere addendum of esotérica. The Miranda Fifth Amendment right to counsel — Sixth Amendment right to counsel dichotomy unmistakably identifies and defines the former as a less protective safeguard. (See for continuing adherence to footnote 4’s concepts, Estelle v Smith, 451 US 454, 470, n 14; Edwards v Arizona, 451 US 477, 484, n 8.) A comparison of Rhode Is. v Innis (446 US 291, supra), with the two cases cited in footnote 4, Massiah v United States (377 US 201, supra) and Brewer v Williams (430 US 387, supra), graphically illustrates that difference.
Massiah v United States (supra) held that the Sixth Amendment right to counsel is implicated in postindictment communications between the accused and agents of the Government. In Massiah, the challenged conversation between the defendant and the codefendant took place in an automobile, and unknown to the accused, the codefendant was a Government agent. “We hold”, the court said (p 206), “that the petitioner was denied the basic protections of that guarantee [Sixth Amendment right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.”
Brewer v Williams (supra) posed a veritable challenge to the court’s commitment to the fundamental tenets of Massiah (supra) and the Johnson v Zerbst (304 US 458, supra) standard of waiver of right to counsel. Brewer v Williams (supra) presented no difficult legal issues: Williams, an escapee from a mental hospital, was arraigned on a charge of abduction of a 10-year-old girl. Miranda warnings were given. Counsel advised Williams not to talk to the police officers who had to transport him, and the attorney obtained an agreement that the officers would not question Williams. During an automobile trip, in the absence of counsel, one of the detectives, in an admitted effort to get information regarding the whereabouts of the missing child, delivered the so-called “Christian burial speech”. *251 Williams directed the police officers to the body. Williams was found guilty of murder. The court, with four Justices dissenting, held, in reliance upon Massiah (supra), that Williams had been denied in the Sixth Amendment right to counsel and, in reliance upon Johnson v Zerbst (supra), that the State had failed to demonstrate a knowing and intelligent waiver of that right. The opinion “for the Court” concluded, “The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child. But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.” (403 US, at p 406.) The dissenting opinions characterized the result as intolerable and focused on, in the Chief Justice’s words, “the irrationality of applying the increasingly discredited exclusionary rule”. (430 US, at p 417.)
Significantly, the opinion for the court emphasized, “The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams could not, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments.” (430 US, at pp 405-406.)
Brewer v Williams (supra), Rhode Is. v Innis (supra), and related cases instruct that Federal constitutional law does not mandate that the Fifth Amendment privilege against self incrimination and the right to counsel under Miranda and the Sixth Amendment right to counsel may not be waived in the absence of counsel. Fare v Michael C. (442 US 707, supra), and Matter of Gault (387 US 1, supra) counsel that as a matter of Federal constitutional law, a more protective per se rule does not govern waiver by juveniles.
New York law boasts of a right to counsel with “protections afforded by our State Constitution beyond those of the Federal — well before certain Federal rights were recognized (e.g., Escobedo v Illinois, 378 US 478; Massiah v United States, 377 US 201).” (People v Settles, 46 NY2d 154, 161.) By contrast with Federal constitutional law, under New York law when the counterpart to the Sixth Amendment right to counsel arises, the right attaches *252 indelibly and may not be waived in the absence of counsel. (See People v Kazmarik, 52 NY2d 322, and cases cited therein; see, also, People v Samuels, 49 NY2d 218.) In this regard, the query posed by Chief Justice Warren Burger in dissent in Brewer v Williams (430 US 387, 419, supra) should be noted: Does the New York law impinge upon the Federal constitutional right to proceed without á lawyer? (See Faretta v California, 422 US 806; see, also, People v McIntyre, 36 NY2d 10.)
Under New York law, established by parallel lines of cases, the right to counsel may also attach indelibly, apart from commencement of formal adversarial criminal proceedings, to a suspect in custody who has retained or assigned counsel or who has requested counsel. Under the New York rule, the suspect may not be questioned in the absence of counsel. (See People v Kazmarick, supra, pp 327-329; see, also, People v Cunningham, 49 NY2d 203.) “The predicates for [the second] branch of the counsel rule,” the Court of Appeals emphasized in People v Kazmarick (supra, p 327), in language strikingly reminiscent of Miranda “are fundamental fairness, the belief that an attorney’s presence is the most effective means of minimizing the disadvantage of the accused person in custody, and the recognition that an unrepresented defendant in custody who has requested an attorney has indicated his own belief that without legal advice he is not competent to deal with those in whose custody he is being held *** That ruling * * * ‘breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary.’ ”
The evolution of the New York right to counsel has not developed in a straight progression. Thus, in People v Lopez (28 NY2d 23, cert den 404 US 840), a case involving a conviction for murder, the Federal District Court granted habeas corpus relief, adopting the reasoning of the dissenters in the New York Court as a statement of Federal constitutional law under Massiah v United States (377 US 201, supra; United States ex rel. Lopez v Zelker, 344 F Supp 1050, 1054). In People v Hobson (39 NY2d 479, 490), Chief Judge Breitel, one of the dissenters in People v Lopez, characterized the Lopez case as an example of the adage *253 about “hard cases” and in a comprehensive opinion tracing the jurisprudential evolution of the New York law of right to counsel established legal basis for treating the case, not as binding precedent but one “overruled in principle”. It will be recalled that the Supreme Court in Massiah v United States (supra) had relied to some extent upon a New York case. (People v Waterman, 9 NY2d 561.)
People v Blake (35 NY2d 331) is further illustration of the uneven development of the New York right to counsel and the interrelationship with evolving Federal constitutional law. New York law had adopted a standard of right to counsel in identification procedures that was more expansive than that later deemed required as a matter of Federal constitutional law in Kirby v Illinois (406 US 682, supra). The Court of Appeals in People v Blake (supra) independently evaluated the pragmatic considerations underlying the Federal rule and the New York experience and then adopted the Federal standard of the traditional scope of the Sixth Amendment right to counsel. (See, also, People v Kazmarick, 52 NY2d 322, 330, supra [Cooke, Ch. J., dissenting].)
Whatever the differences between them, New York and Federal jurisprudence adopt the Fifth Amendment right to counsel — Sixth Amendment right to counsel dichotomy. New York decisional developments have had legislative counterparts in some areas, particularly with regard to the protective public policy towards juveniles. As indicated above, sections of the Family Court Act were cited with favor in Matter of Gault (387 US 1, supra). Section 249-a of the Family Court Act, enacted in 1978, further provides: “A minor who is a subject of a juvenile delinquency or person in need of supervision proceeding shall be presumed to lack the requisite knowledge and maturity to waive the appointment of a law guardian. This presumption may be rebutted only after a law guardian has been appointed and the court determines after a hearing at which the law guardian appears and participates and upon clear and convincing evidence that (a) the minor understands the nature of the charges, the possible dispositional alternatives and the possible defenses to the charges, (b) the minor possesses the maturity, knowledge and intelligence neces *254 sary to conduct his own defense, and (c) waiver is in the best interest of the minor.” Manifestly, section 249-a of the Family Court Act does prescribe a more protective standard for waiver of the right to counsel. The plain and unambiguous language of the section and the legislative history impel the construction that the provision applies to the traditional Sixth Amendment right to counsel concept. (See Matter of Dominick F., 74 AD2d 485; but cf. Matter of Schaefer, 97 Misc 2d 487.)
The right to counsel implicated in the instant matter does not fall within the Sixth Amendment right to counsel category. Neither Federal nor New York law proscribes such classification. Indeed, as developed above, both Federal and New York law subscribe to the Fifth Amendment right to counsel — Sixth Amendment right to counsel dichotomy. Section 249-a of the Family Court act is inapplicable.
That New York law does not presume a lack of capacity on the part of a juvenile in the instant circumstances to waive counsel in the absence of counsel, however, does not mean that lack of capacity to comprehend constitutional rights and waiver in fact would not require suppression of a proffered statement or statements. Indeed, in applying the Fare v Michael C. (442 US 707, supra) totality-of-the-circumstances standard to the facts involved herein, that very fact emerges as critical. Respondent lacked the capacity and ability to comprehend the Fifth Amendment privilege of self incrimination and the right to counsel and was unable to understand the concept of waiver. All of the evidence is consistent with that finding. Petitioner has failed to sustain the burden of proving a voluntary, intelligent and knowing waiver of his rights by respondent. (See Lego v Twomey, 404 US 477, 489; People v Valerius, 31 NY2d 51, 55; People v Huntley, 15 NY2d 72, 78.)
The motion to suppress is granted.*

 Decision including findings of fact was rendered April 3, 1981.